[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Rodriguez*, Slip Opinion No. 2026-Ohio-2573.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-2573

THE STATE OF OHIO, APPELLANT, *v.* RODRIGUEZ, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Rodriguez*, Slip Opinion No. 2026-Ohio-2573.]**

*Criminal law—In a case involving carbon-copy counts of the same offense, the State need only present evidence of discernible facts corresponding to each count in order to obtain convictions on those counts—Criminal defendant indicted on 11 carbon-copy counts of endangering children based on disciplinary acts she took against her minor stepson—The jury instructions, verdict forms, and trial-court judge's answers to jury's questions were legally sufficient, and the State presented sufficient evidence of discernible facts that allowed jury to differentiate between the counts, thus negating due-process and double-jeopardy concerns—Court of appeals' judgment reversing convictions and barring retrial under double-jeopardy protections reversed and cause remanded to court of appeals for consideration of previously unaddressed assignment of error.*

(No. 2025-0066—Submitted January 6, 2026—Decided July 9, 2026.)

APPEAL from the Court of Appeals for Hamilton County,
No. C-240075, 2025-Ohio-53.

_____

KENNEDY, C.J., authored the opinion of the court, which DEWINE, MILLER, HAWKINS, and BALDWIN, JJ., joined. FISCHER, J., concurred in judgment only. BRUNNER, J., dissented, with an opinion. MARK C. MILLER, J., of the Third District Court of Appeals, sat for DETERS, J. CRAIG R. BALDWIN, J., of the Fifth District Court of Appeals, sat for SHANAHAN, J.

**KENNEDY, C.J.**

{¶ 1} This discretionary appeal from a judgment of the First District Court of Appeals presents the question whether the State can obtain convictions on carbon-copy counts of the same offense only by presenting separate evidence to substantiate each count. We answer that question in the affirmative.

{¶ 2} Appellee, Amy Rodriguez, was indicted on 11 second-degree felony counts of endangering children and was later provided with a bill of particulars alleging details about her conduct to substantiate each count. At trial, appellant, the State of Ohio, provided distinct evidence of each abusive act Rodriguez was alleged to have committed and both parties addressed which acts corresponded to each count. During deliberations, the jury twice asked the trial-court judge to specify which act corresponded to each count. Without objection, the judge answered by directing the jury to refer to the jury instructions and to consider the evidence. The jury found Rodriguez guilty on four of the 11 counts.

{¶ 3} On appeal, the First District reversed Rodriguez's convictions, finding plain error in the jury instructions and/or verdict forms for failing to specify which act corresponded to each count and holding that retrial was precluded under the doctrine of double jeopardy. 2025-Ohio-53, ¶ 76 (1st Dist.). In contrast, we conclude that the State presented enough evidence to substantiate and differentiate

between each count and that the jury instructions, verdict forms, and trial-court judge's answers to the jury's questions were legally sufficient. The jury's convicting Rodriguez of only four of the 11 counts further shows that there was no error. The jury could distinguish between the counts, thereby negating any due-process or double-jeopardy concerns. We therefore reverse the First District's judgment and remand this matter to that court for consideration of Rodriguez's second assignment of error.

## I. FACTS AND PROCEDURAL HISTORY

### A. The Charging Documents

{¶ 4} On February 25, 2022, Rodriguez was indicted on 11 carbon-copy counts of endangering children under R.C. 2919.22(B)(2), second-degree felonies, based on disciplinary acts she took against her minor stepson, C.D., between January 2018 and April 2021. Counts 1 through 4 and 6 through 11 identically read:

> The Grand Jurors of the County of Hamilton, in the name and by authority of the State of Ohio, upon their oaths do find and present that AMY M RODRIGUEZ, on an undetermined date between January in the year Two Thousand Eighteen and April in the year Two Thousand Twenty-One at the county of Hamilton and State of Ohio aforesaid, recklessly tortured or cruelly abused C.D., a child under eighteen years of age, or a mentally or physically handicapped child under twenty-one years of age, and the violation resulted in serious physical harm to C.D., in violation of Section 2919.22(B)(2) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

(Capitalization in original and boldface deleted.)  Count 5 was similar, though it was based on conduct that occurred "from on or about" January 1 to January 2, 2021.  On March 9, 2022, Rodriguez requested a bill of particulars describing the "nature of the conduct" for each count.  Two days later, the State provided a bill of particulars, organized by paragraph to mirror the indictment, outlining the specific disciplinary act corresponding to each count:

[1.]  Specifically, C.D. was forced to sit on a bench for multiple hours and days at a time.  At times he was tethered to the bench with locked restraints making it impossible for him to leave.

[2.] C.D. was forced to stand in a corner facing the wall for up to 14 hours per day for multiple days in a row.

[3.] C.D.'s punishments were moved to his bedroom where he was forced to stand in an imaginary box for the entire day while classical music blared from an alarm clock in the room.  At the time he was only allowed to wear his little brother's shorts.  This took place continuously for multiple weeks.

[4.] C.D. was also forced to lean against a wall for extended periods of time holding himself up with only his fingertips causing serious discomfort and pain.

[5.] Between 1/1/21 and 1/2/21 C.D. was strapped to his bed with locked restraints on his wrists and ankles throughout the night.

[6.] Eventually C.D. was confined to his room without physical human contact over a course of many days.  An alarm was on the door and he was monitored by 3 cameras for the purpose of preventing C.D.'s escape.

[7.] C.D. was not provided appropriate warm clothing or bedding. Often he was permitted only to wear a pair of his young brother's shorts and was provided only 1 baby size blanket.

[8.] C.D. was beaten by [Rodriguez] with a belt on many occasions. On one occasion he was hit so severely [Rodriguez] caused his legs to bleed.

[9.] C.D. was also beaten by [Rodriguez] using a spoon on many occasions. On one occasion he was struck more than 70 times.

[10.] Food was restricted from C.D. as a form of punishment. He was denied access to food by it being locked away in the kitchen. He suffered unhealthy weight loss as a result.

[11.] C.D. was restricted from using the restroom for extensive periods of time. C.D. was forced to wear a diaper. He could not ask to use the restroom. If C.D. had an accident and urinated on himself [Rodriguez] forced C.D. to take a cold shower.

### B. The Evidence Presented at Trial

{¶ 5} The trial commenced on October 12, 2023, and the trial-court judge prohibited the jurors from taking notes. The State presented specific evidence of each of Rodriguez's disciplinary acts against C.D. through the testimony of multiple witnesses, including C.D.; his younger brother, P.D.; his father, A.D.; Rodriguez's daughter, K.S.; Rodriguez's niece, Angela Rodriguez; and multiple medical professionals. The State also utilized a trauma timeline C.D. had previously compiled, which outlined each disciplinary act. The State alleged that for Counts 1 through 4 and 6 through 11, between January 2018 and April 2021, a specific incident occurred or Rodriguez used a punishment technique on multiple occasions to constitute ten separate child-endangering offenses. The State alleged that for

Count 5, a specific incident occurred in January 2021 that constituted a child-endangering offense.

{¶ 6} Regarding Count 1, C.D. testified that Rodriguez used the punishment technique of making him sit on a bench for multiple days for over a month, from the moment he woke up until he went to bed. P.D. testified that while Rodriguez required him to sit on the bench for about an hour, C.D. was required to sit there all day. C.D. was brought food and was required to eat it while sitting on the bench. C.D. testified that he could not do anything while sitting on the bench unless he was doing a chore. However, when Rodriguez discovered that C.D. was sneaking food while doing chores, he was no longer allowed to do chores. Both boys recalled Rodriguez's tethering C.D. to the bench to ensure he stayed sitting on it. K.S. echoed C.D.'s testimony, while A.D. simply classified the bench as a "timeout bench."

{¶ 7} As for Count 2, C.D., P.D., Angela, K.S., and A.D. all described Rodriguez's punishment technique of forcing C.D. to stand facing a corner. C.D. testified that this punishment lasted for a couple of weeks from the moment he woke up until bedtime—which P.D. corroborated. K.S. also testified that this punishment lasted for hours, while A.D. testified that C.D. would be sent to the corner multiple times a day in up to one-hour increments each time. Like when she required him to sit on the bench, Rodriguez forced C.D. to eat food given to him while facing the corner. Rodriguez installed a camera to ensure that C.D. did not lean against the wall, close his eyes, or fall asleep.

{¶ 8} Concerning Count 3, C.D. and P.D. testified that when Rodriguez moved C.D.'s punishments to his upstairs bedroom, she used the punishment technique of requiring him to stand in an "invisible square" for entire days from when he woke up until bedtime, while A.D. testified that C.D. was confined to his bedroom throughout the day for about eight hours. C.D. said that this punishment in his bedroom occurred when some family members became uncomfortable seeing

him facing the corner. Similar to the bench and corner punishments, the invisible-square punishment involved delivery of C.D.'s food to his room. P.D. testified that C.D. wore only a diaper while being forced to stand in the invisible square, and C.D. said that he was eventually allowed to wear only P.D.'s shorts. A.D. recalled that Rodriguez made C.D. exercise to abate the effects of long-term standing, which C.D. described as red, swollen ankles and feet. C.D., P.D., and A.D. testified that Rodriguez blared music in the room, which C.D. identified as classical music. A.D. recalled that the music made him anxious, yet Rodriguez played it continuously to prevent C.D. from hearing anything happening on another level of the house.

{¶ 9} Regarding Count 4, C.D., P.D., and K.S. testified about Rodriguez's punishment technique of making C.D. lean against a wall on his fingertips and scoot his feet back until the only points of contact with the wall were his fingertips. C.D. recalled having to maintain this position for up to 30 minutes, until his fingers became numb. P.D. stated that Rodriguez reserved this punishment for only C.D.

{¶ 10} As for Count 5, A.D. and his sons testified about a specific incident in which Rodriguez tethered C.D. to C.D.'s bed in an "X" shape, which the indictment alleged occurred "from on or about" January 1 to January 2, 2021. C.D. spent the night like that wearing only a diaper.

{¶ 11} Regarding Count 6, the jury heard testimony from C.D., P.D., and A.D. about Rodriguez's punishment technique of forced isolation. All three witnesses testified that Rodriguez kept C.D. in his bedroom and installed cameras and a door alarm to ensure that he did not leave. At one point, the windows even had alarms, according to A.D. C.D. recounted that he could not interact with others. P.D. said that he would bring C.D. meals but that he would get yelled at if he ever tried to talk to him.

{¶ 12} Concerning Count 7, the brothers testified to Rodriguez's punishment technique of not providing C.D. with clothing or blankets. C.D. wore only diapers until Rodriguez permitted him to wear P.D.'s shorts. He slept wearing

only a diaper and with only a small baby blanket—no sheets, additional blankets, or pillows. A.D. agreed that C.D. wore pull-ups.

{¶ 13} As for Counts 8 and 9, C.D., P.D., K.S., Angela, and A.D. all testified about Rodriguez's punishment technique of spanking C.D. C.D. said that he was spanked excessively with a metal cooking spoon or a belt many times, which left marks on his body and made sitting and walking painful. P.D. claimed that Rodriguez spanked C.D. more than twice a week, giving C.D. more than ten swats at a time, which left bruises and welts on C.D.'s body. A.D. said that Rodriguez spanked C.D. three to four times a week, leaving marks. Regarding Count 8, C.D. recounted a specific incident in which Rodriguez struck him with a wooden cooking spoon until it broke. C.D. testified that once the wooden spoon broke, Rodriguez beat him with a belt until his skin broke and was scarred. Concerning Count 9, K.S. testified that during one specific incident, Rodriguez spanked C.D. 75 times and that after a different incident, C.D. could not walk properly.

{¶ 14} Regarding Count 10, multiple witnesses testified for the State, detailing how Rodriguez used the lack of food as a punishment technique. C.D. testified that his food differed from that of his family, and he received only plain cereal with almond milk or a plain lunchmeat or peanut-butter-and-jelly sandwich with baby carrots. When C.D. was hungry, he was denied more food, and Rodriguez searched him and locked the pantry, freezer, and refrigerator to prevent him from taking any food. A.D. echoed C.D.'s testimony. P.D. also corroborated C.D.'s testimony and discussed how C.D. was required to pack a lunchmeat or peanut-butter-and-jelly-sandwich to eat at school and when the family ate at a restaurant. K.S. added that C.D. was not permitted to have snacks or seconds when he was allowed to eat dinner with the family and that she told Rodriguez that C.D. appeared very thin. Angela described one incident in which Rodriguez prohibited C.D. from ordering food at a restaurant when other family members did and punished C.D. when someone gave him food to eat.

{¶ 15} Count 10 was further bolstered by medical professionals' testimony and C.D.'s medical records. Multiple medical professionals expressed concerns about Rodriguez's using food as a punishment technique. For instance, Dr. Trisha Marshall of the Cincinnati Children's Hospital described C.D.'s admittance to the hospital for hypothermia, Raynaud's syndrome, and low phosphorus levels in his blood that was attributed to malnutrition. C.D.'s records indicated that at about five years old, C.D. was in the 91st percentile for his weight for his age. However, at 12 years old, he weighed 30.8 kilograms, in the 2.5th percentile. Seven days after that weight was taken, C.D. had gained weight, weighing 32.1 kilograms. When he returned to the hospital a little over two months later, C.D. had lost about 8.8 pounds, weighing only 28.1 kilograms, which placed him in the 0.29th percentile. Despite these facts, Rodriguez told doctors that C.D. ate continuously and blamed his malnutrition on "variations in psychological stress."

{¶ 16} Another doctor, Dr. Ankita Zutshi of Cincinnati Children's Hospital, noted that C.D. was medically malnourished and that she had concerns about Rodriguez's comments on restricting food. According to Dr. Zutshi, Rodriguez was frustrated because she thought the hospital allowed C.D. to eat too much and she stated that he would not receive extra snacks or the recommended portions of food at home.

{¶ 17} Finally, concerning Count 11, C.D., P.D., K.S., and A.D. testified about Rodriguez's punishment technique of prohibiting C.D. from using the restroom. The witnesses explained that C.D. had to obtain Rodriguez's permission to use the restroom when he was being punished by sitting on the bench, facing the corner, or standing in his room. Rodriguez did not always give C.D. permission—which C.D., K.S., and A.D. said resulted in C.D. urinating on himself. C.D. described how he would then have to take a cold shower. Multiple witnesses discussed C.D.'s wearing a diaper.

### C. Closing Arguments

{¶ 18} At the close of the State's case-in-chief, Rodriguez made an oral motion for judgment of acquittal under Crim.R. 29. The trial-court judge denied the motion. At the close of her case-in-chief, Rodriguez renewed her motion, which the trial court again denied.

{¶ 19} Before closing arguments, the State moved to amend Counts 1 and 4 to third-degree felonies to remove the serious-physical-harm language in order to conform with the evidence that had been presented. The trial-court judge granted the motion.

{¶ 20} In its closing argument, the State used C.D.'s trauma timeline to walk through the counts of the indictment. The State discussed each count one by one:

> We've got Count 1, Count 1 relates to this behavior right here where he was forced to sit on the bench. And Count 1 stretches over to the next timeline where he was tied to the bench. So that's that behavior there.
>
> Count 2, he was then forced to stand in the corner. He was forced to stand in the corner all day 14 plus hours a day.
>
> He was not allowed to use the bathroom, he had to eat his meals there, he had a camera on him in case he would have closed his eyes or fallen asleep so that he could be woken up.
>
> We have Count 3. This is after [C.D.] was put in the Children's Hospital after he ran away.
>
> He came back—he came back—I'm sorry—to [Rodriguez's] house, and he was immediately put right back up into his bedroom, but there were a few little differences he remembered about being put[] back in his bedroom at this time and the time that he was put up there before.

He remembers only two cameras were on him at this time. And he also remembers that he was now put in his brother's little shorts, rather than having to wear a diaper.

And he also remembers classical music was blasting, and he attributes that to the fact that he ran away at one point in time because he could follow the foot patterns of the people in the house to know when they might be occupied and he could get out there, and he remembered that now the music was put on him so that he couldn't follow the foot patterns of everybody anymore.

Then we move to Count 4, and I think he indicated to you that a form of punishment that he had to engage in a lot of different times was standing against the wall using his fingertips.

He said it happened [a] lot of times, but the one time he really remembered was when he ran away and he came back home.

Now, we go to Count 5, and this is him being restrained to the bed using the child restraints. He indicates that he was tied with both hands above him and both hands below him—or both feet below him in an X.

Let me go to Count 6, and this is before he ran away when he was in his bedroom. He was up there all day long, no human contact, three cameras on him, a door alarm, he had to stand in an invisible square, keep on moving, his meals were served to him up there, and he was isolated in that fashion for days on end.

Count 7 goes across the entire course of this—this timeline. Food was—oh, I'm sorry—7 is the inadequate clothing, I believe.

Let me just double check this to make sure I have it right.

Yes, 7 is the abuse he suffered by not being provided adequate clothing. And he testified throughout that he was either

standing in nothing but a diaper, his brother's shorts, he was not given pajamas to wear. He only had a little baby blanket to use. He didn't have any sort of bedding or pillow or anything like that to help clothe him or give him warmth.

Count 8 is being hit with a spoon and a belt. That's Count 8 and 9. He was hit with a spoon and a belt many times, but he specifically testified about an occasion in which [Rodriguez] started out with a wooden spoon, hit him so much with it that the spoon broke, and she continued to go forward with a belt. The belt buckle struck him, and it caused him to bleed. And so he talked about that time.

And then he also talked about just being hit with a spoon over and over and over again, and that's the time when [K.S. and her brother] counted 75 strikes to his person. And so those are two different episodes that we're talking about there.

Count 10 was carried out throughout this entire time. And that was the inadequate food. And you've heard over and over and over again that during the course of this time food was used as a punishment, he was restricted from what food he could eat, and as a result he suffered malnourishment because of it.

Count 11 are these two here. You heard much testimony about his use of the bathroom being restricted. He wasn't allowed to use the bathroom when he wanted to. If he asked, he could get into trouble. He had to wait until he was given permission.

And so he was then told to wear diapers, and if he had an accident he would be thrown in a cold shower as punishment for having the accident.

Later, the State walked through the evidence for each count, naming specifically Counts 1 and 5 through 11.  In her closing argument, Rodriguez's attorney walked through the evidence as well, discussing specifically the tethering alleged in Count 1.

### D.  The Jury Instructions and Verdict Forms

{¶ 21} Following closing arguments, the trial-court judge provided instructions to the jury.  The instructions for each count were similar.  The instructions for Counts 1 and 4 read:

> The Defendant, AMY RODRIGUEZ, is charged with Endangering Children.  Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on an undetermined date between January 2018 and April 2021, and in Hamilton County, Ohio, the Defendant, AMY RODRIGUEZ, recklessly tortured or cruelly abused a child, C.D., in violation of Section 2919.22(B)(2) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

(Capitalization in original.)  The judge defined the terms "recklessly," "torture," "cruelly," "abuse," and "child."  The instructions for Counts 2, 3, and 6 through 11 read:

> The Defendant, AMY RODRIGUEZ, is charged with Endangering Children.  Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on an undetermined date between January 2018 and April 2021, and in Hamilton County, Ohio, the Defendant, AMY RODRIGUEZ, recklessly tortured or cruelly abused a child, and the violation resulted in serious physical

harm to C.D., in violation of Section 2919.22(B)(2) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

(Capitalization in original.)  The judge referred to the previous definitions of terms and also defined "serious physical harm to persons."  The instructions for Count 5 were identical to the instructions for Counts 2, 3, and 6 through 11 but substituted the specific period of January 1 to January 2, 2021.  Similarly, the verdict forms were identical apart from the differing count numbers in the captions and with the forms for Counts 1 and 4 indicating third-degree felonies, not second-degree felonies.

### E.  Jury Deliberations and Verdict

{¶ 22} The jury then retired for deliberations.  The next day, the jury submitted a note to the trial-court judge with the following question: "For [Rodriguez's] 11 counts, which punishment corresponds to each count?"  After consulting the parties, the judge answered by referring the jury "to the jury instructions and the testimony and the evidence that was presented."  Neither party objected to the judge's answer.

{¶ 23} On the next day of deliberations, the jury submitted another note, which read: "Our question is 'which count aligns with each separate and distinct matter?' We are referencing page 6 under 'multiple counts' in the jury instructions."  The trial-court judge answered, "My answer is the same as it was on Friday; refer to the jury instructions, use your collective memories to apply to the testimony and evidence that was presented to the instructions."

{¶ 24} Later that day, the jury returned with its verdicts, presenting the trial-court judge with signed verdict forms.  It convicted Rodriguez on Counts 2, 4, 6, and 10 and acquitted her on the other seven counts.  Rodriguez renewed her motion for judgment of acquittal, which the judge again denied.  At sentencing, Rodriguez

outlined the context for each count on which she had been convicted. The judge sentenced her to an aggregate prison term of three to four and a half years.

### F. Appeal to the First District

{¶ 25} Rodriguez appealed to the First District, asserting two assignments of error. 2025-Ohio-53 at ¶ 22, 75 (1st Dist.). First, she claimed that the trial court committed plain error by giving the jury instructions and/or verdict forms without providing the context for each count. *Id.* at ¶ 22. She contended that this alleged error violated her due-process rights and double-jeopardy protections. *Id.* Second, she claimed that her trial counsel was ineffective for failing to object to the jury instructions and verdict forms. *Id.* at ¶ 75. In a two-to-one decision, the First District sustained the first assignment of error, reversed the trial court's judgment, barred retrial, and determined that the second assignment of error was moot. *Id.* at ¶ 70, 74-76.

{¶ 26} The First District majority held that when a defendant is charged with carbon-copy counts of endangering children and each count corresponds to a specific act of torture or abuse, a trial court plainly errs when it does not provide "the jury with instructions and/or verdict forms for each count that specify the conduct that was the basis of the count." *Id.* at ¶ 1; *see also id.* at ¶ 2. The majority found that the trial-court judge's answers to the jury's questions were problematic for similar reasons. *See id.* at ¶ 47-48. While acknowledging the absence of binding authority about the information that must be contained in jury instructions and verdict forms when a defendant is charged with carbon-copy counts of the same offense, the majority relied on a case from the United States Court of Appeals for the Sixth Circuit, one from the Second District Court of Appeals, and one from the Supreme Court of Kentucky. *See id.* at ¶ 33-40, 47. The majority held that the trial court's error here was plain and obvious, again relying on Kentucky precedent. *See id.* at ¶ 55-60.

**{¶ 27}** The First District majority determined that Rodriguez had suffered prejudice because there was a reasonable probability that, given the jury's confusion as displayed by its questions, the jury convicted her based on evidence that did not correspond to the counts for which it returned guilty verdicts. *See id.* ¶ 68. Finally, because Rodriguez could not know what conduct led to her convictions, the majority said, it needed to correct the error to prevent a manifest miscarriage of justice. *See id.* at ¶ 70. Therefore, the First District reversed the trial court's judgment and barred retrial under double-jeopardy protections. *Id.* at ¶ 76.

**{¶ 28}** The dissenting appellate-court judge contended that Ohio law does not require jury instructions or verdict forms to differentiate between counts. 2025-Ohio-53 at ¶ 77 (1st Dist.) (Winkler, J., dissenting). Further, he would have held that the jury had sufficient information to distinguish between the counts because the State's closing argument, though not evidence, provided "a count-by-count reiteration" of Rodriguez's conduct. *Id.*

**{¶ 29}** The State appealed, and we accepted jurisdiction on the following two propositions of law:

> Proposition of Law I: When an individual is charged with multiple counts of the same crime, to sustain a conviction for each count the State must only present evidence of discernible facts to substantiate the separate counts.
>
> Proposition of Law II: A reviewing court may not find plain error in the absence of binding authority that clearly demonstrates an obvious defect in the proceedings below.

*See* 2025-Ohio-1483.

**{¶ 30}** In resolving the State's first proposition of law, we hold that no error occurred. We therefore decline to address the State's second proposition of law.

## II. LAW AND ANALYSIS

### A. Standard of Review

{¶ 31} Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Therefore, when a defendant fails to object to trial errors, plain-error review applies. *See State v. Bailey*, 2022-Ohio-4407, ¶ 7. Under plain-error review, a defendant must show (1) an error or "deviation from a legal rule," (2) that the error was plain or obvious, and (3) that the error affected substantial rights, meaning the error impacted the trial's outcome. *State v. Barnes*, 2002-Ohio-68, ¶ 20. Even then, a court should intercede "'only to prevent a manifest miscarriage of justice.'" *Id.* at ¶ 21, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Because Rodriguez failed to object to the jury instructions, verdict forms, or trial-court judge's answers to the jury's questions, we review the record only for plain error.

{¶ 32} After a thorough review of the record, we conclude that the error found by the First District majority did not occur. By following legal requirements and separating the counts at trial, the State provided sufficient evidence of discernible facts to enable the jury to differentiate between the counts.

{¶ 33} Undertaking our review, we first analyze the sufficiency of the jury instructions, verdict forms, and trial-court judge's answers to the jury's questions. We then examine whether the State provided sufficient, distinct evidence that allowed the jury to distinguish between the counts, thereby negating due-process and double-jeopardy concerns.

### B. The Jury Instructions, Verdict Forms, and Trial-Court Judge's Answers to the Jury's Questions Were Legally Sufficient

{¶ 34} In a criminal trial, at the close of the evidence, a trial-court judge provides the jury with instructions for use during deliberations. Crim.R. 30(A). "Jury instructions are critically important" as they help juries weigh the evidence

and apply the law. *State v. Griffin*, 2014-Ohio-4767, ¶ 5. They must be "'correct [and] pertinent statement[s] of the law that [are] appropriate to the facts.'" *State v. Price*, 2020-Ohio-4926, ¶ 22, quoting *State v. White*, 2015-Ohio-492, ¶ 46. Judges must give juries all instructions needed to "'"weigh the evidence and discharge its duty as the fact finder."'" *Id.*, quoting *White* at ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Apart from a few instructions that a judge must give, *see, e.g.*, R.C. 2945.11 (a judge must inform a jury that the jury "is the exclusive judge of all questions of facts" and "must not consider the punishment" except in certain cases), a judge has broad discretion in fashioning jury instructions, *Price* at ¶ 22.

{¶ 35} Trial-court judges also provide jurors with forms on which to record the verdict. *See* Crim.R. 31(A). "The [jury's] verdict shall be unanimous. It shall be in writing, signed by all jurors concurring therein, and returned by the jury to the judge in open court." *Id.*

{¶ 36} During deliberations, a jury may ask the trial-court judge for "'further instruction, or clarification of an instruction previously given.'" *State v. Lindsey*, 2000-Ohio-465, ¶ 37, quoting *State v. Carter*, 1995-Ohio-104, paragraph one of the syllabus. In such situations, the judge "'has discretion to determine [his or her] response to that request.'" *Id.*, quoting *Carter* at paragraph one of the syllabus. This court has held that a judge does not abuse his or her discretion by instructing the jury to refer to the written instructions instead of orally providing additional ones when the written instructions "clearly and comprehensively answered the question." *Id.* at ¶ 38. We presume that jurors follow a judge's instructions. *State v. Robb*, 2000-Ohio-275, ¶ 137.

{¶ 37} Here, the jury instructions were sufficient. R.C. 2919.22(B)(2) prohibits a person from "[t]ortur[ing] or cruelly abus[ing]" a child under 18 years of age. "If the offender violates [R.C. 2919.22(B)(2)], except as otherwise provided in this division, endangering children is a felony of the third degree. If the violation

results in serious physical harm to the child involved . . . , endangering children is a felony of the second degree. . . ." R.C. 2919.22(E)(3).

{¶ 38} The jury instructions mirrored the statute. For Counts 1 and 4, the jury received the following instructions:

> The Defendant, AMY RODRIGUEZ, is charged with Endangering Children. Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on an undetermined date between January 2018 and April 2021, and in Hamilton County, Ohio, the Defendant, AMY RODRIGUEZ, recklessly tortured or cruelly abused a child, C.D., in violation of Section 2919.22(B)(2) of the Ohio Revised Code and against the peace and dignity of the State of Ohio.

(Capitalization in original.) The trial-court judge also defined the terms "recklessly," "torture," "cruelly," "abuse," and "child." Because Counts 1 and 4 alleged third-degree felonies, the judge did not have to provide instructions defining "serious physical harm," R.C. 2919.22(E)(3).

{¶ 39} For Counts 2, 3, and 6 through 11, the trial-court judge instructed the jury as follows:

> The Defendant, AMY RODRIGUEZ, is charged with Endangering Children. Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on an undetermined date between January 2018 and April 2021, and in Hamilton County, Ohio, the Defendant, AMY RODRIGUEZ, recklessly tortured or cruelly abused a child, and the violation resulted in serious physical

harm to C.D., in violation of Section 2919.22(B)(2) of the Ohio
Revised Code and against the peace and dignity of the State of Ohio.

(Capitalization in original.) The judge provided similar instructions for Count 5 but substituted the specific period of January 1 to January 2, 2021. These counts alleged second-degree felonies, so the judge defined the term "serious physical harm to persons," as required by R.C. 2919.22(E)(3). Accordingly, the jury instructions mirrored R.C. 2919.22(B)(2) and (E)(3), meaning they correctly explained the law applicable to each count and enabled the jury to weigh the evidence and reach a conclusion.

{¶ 40} Nothing in Ohio law requires that jury instructions provide the factual context for each count. In fact, that would go beyond the requirement that jury instructions present a "'correct [and] pertinent statement of . . . the law,'" *Price*, 2020-Ohio-4926, at ¶ 22, quoting *White*, 2015-Ohio-492, at ¶ 46. Rodriguez did not object to the trial-court judge's instructions to the jury, and the verdicts show that the jury had all it needed to discharge its duty. In this court, Rodriguez makes only the conclusory argument that the instructions were insufficient because during deliberations, the jury twice asked the judge to differentiate between the counts. However, the judge instructed the jurors to refer to the jury instructions and rely on their collective memories of the evidence. Importantly, the jury acquitted Rodriguez on seven counts while convicting her on four others, thereby showing its ability to differentiate between the counts.

{¶ 41} The verdict forms were also sufficient. They reduced the unanimous verdict into writing, were signed by all jurors, and were returned to the trial-court judge. Nothing in Ohio law required the verdict forms to contain each count's factual context or created special requirements for cases involving indictments containing multiple counts of the same offense.

{¶ 42} Moreover, Rodriguez has not shown an error in the trial-court judge's answers to the jury's questions. The jury twice asked about each count's abusive act. The judge used her discretion in her answers, instructing the jurors to review the evidence and testimony as they remembered it and to refer to the written jury instructions. Neither party objected to the judge's answers to the jury's questions.

{¶ 43} An abuse of discretion "means a ruling that is unreasonable, arbitrary, or unconscionable." *State v. McAlpin*, 2026-Ohio-148, ¶ 14. Here, the trial-court judge's unobjected-to answers were not unreasonable, arbitrary, or unconscionable, meaning that the judge did not abuse her discretion in answering the jury's questions.

{¶ 44} Nevertheless, Rodriguez notes that if the jury instructions were sufficient, the jury would not have asked the same question twice. However, we presume that a jury follows a trial-court judge's instructions, *Robb*, 2000-Ohio-275, at ¶ 137, and the outcome here corroborates that principle. The jury did not acquit or convict Rodriguez on all 11 counts. Rather, it found Rodriguez guilty on only four counts, meaning that it used the trial-court judge's answers and parsed out the evidence for each count. Therefore, the judge provided sufficient answers to the jury's questions.

{¶ 45} Overall, the jury instructions, verdict forms, and trial-court judge's answers to the jury's questions were all legally sufficient.

## C. The State Presented Sufficient Evidence of Discernible Facts that Allowed the Jury to Differentiate Between the Counts, Thus Negating Due-Process and Double-Jeopardy Concerns

{¶ 46} Despite the legal sufficiency of the jury instructions, verdict forms, and trial-court judge's answers to the jury's questions, Rodriguez claims that the First District majority correctly concluded that the jury could not differentiate between the counts, therefore creating due-process and double-jeopardy concerns.

However, the State presented evidence of 11 disciplinary acts that each corresponded to a count in the indictment and referred to those acts during closing argument: Count 1, forcing C.D. to sit on a bench; Count 2, forcing him to stand in a corner; Count 3, forcing him to stand in an "imaginary box" in his bedroom; Count 4, forcing him to lean against the wall on his fingertips; Count 5, tethering him to his bed overnight in January 2021 with no clothing or blankets; Count 6, isolating him in his bedroom with cameras and alarms; Count 7, allowing him to wear only a diaper or his brother's shorts and to have only a baby blanket; Count 8, beating him with a belt; Count 9, beating him with a spoon; Count 10, restricting food from him to the point of malnourishment; and Count 11, prohibiting him from using the bathroom.

{¶ 47} Accordingly, the State sufficiently distinguished between the counts to negate any due-process or double-jeopardy concerns.

*1. The Charging Documents, Evidence, and Closing Arguments Provided Rodriguez with Sufficient Notice and the Ability to Protect Herself from Double Jeopardy as Required by Due Process*

{¶ 48} The Sixth Amendment to the United States Constitution requires that a criminal defendant "be informed of the nature and cause of the accusation." Article I, Section 10 of the Ohio Constitution states that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof." Due process requires that the defendant have notice of "'all material facts constituting the essential elements of an offense [in order to provide him or her] with adequate notice and an opportunity to defend.'" *State v. Troisi*, 2022-Ohio-3582, ¶ 21, quoting *State v. Sellards*, 17 Ohio St.3d 169, 170 (1985). This can occur through an indictment stating the offense the defendant allegedly committed. *Id.*; *see also* R.C. 2941.05; *State v. Childs*, 2000-Ohio-425, ¶ 33. When the defendant wants more facts than those set forth in the indictment, the defendant may request

a bill of particulars "'to inform [him] of the exact nature of the charges against him so that he can prepare his defense thereto.'" *State v. Haynes*, 2022-Ohio-4473, ¶ 20, quoting *State v. Fowler*, 174 Ohio St. 362, 364 (1963); *see also* R.C. 2941.07.

{¶ 49} Additionally, due process requires that a criminal defendant have notice of the offense in order to enable the defendant "'to protect himself from any future prosecutions for the same offense.'" *Troisi* at ¶ 21, quoting *Sellards* at 170. This reflects the protections against double jeopardy found in both the United States and Ohio Constitutions. *See* U.S. Const., amend. V ("nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb"); Ohio Const., art. I, § 10 (prohibiting a person from being "twice put in jeopardy for the same offense"). Double jeopardy can become an issue when the defendant cannot "plead convictions or acquittals as a bar to future prosecutions" given a lack of specificity in an indictment or at trial. *Valentine v. Konteh*, 395 F.3d 626, 634 (6th Cir. 2005). The State can also run afoul of double jeopardy when undifferentiated counts result in a "very real possibility that [the defendant] would be subject to double jeopardy in his initial trial by being punished multiple times for what may have been the same offense." *Id.* at 634-635.

{¶ 50} These concepts are exemplified in *State v. Sowell*, 2016-Ohio-8025, a case Rodriguez notably fails to address. In *Sowell*, a multicount indictment included "two pairs of identically phrased rape counts." *Id.* at ¶ 114. Sowell claimed that this violated his due-process rights and double-jeopardy protections since he had inadequate notice of the specific charges against him and the evidence could not be separated into the counts, leaving him subject to future prosecution for the same offenses. *Id.* at ¶ 116, 123. We rejected Sowell's claim, observing that the indictment provided specific dates on which the offenses took place and that the State had presented separate evidence for each count. *Id.* at ¶ 122. Therefore, Sowell had notice of the charges against him that was sufficient for due process,

and the jury could determine which evidence supported which count, thus negating any double-jeopardy concerns. *See id.* at ¶ 122-123.

{¶ 51} Here, like in *Sowell*, Rodriguez had notice of the charges against her that was sufficient for due process. The indictment provided a statement of each of the 11 offenses the State believed she had committed and referred to the statute, R.C. 2919.22(B)(2), that the State alleged she had violated. While the indictment did not give the factual context for each count, it did provide Rodriguez with notice of the charges against her—endangering C.D. by recklessly torturing or cruelly abusing him, resulting in serious physical harm to him. When she wanted more information about each count, Rodriguez requested a bill of particulars, which the State provided. That document contained the criminal conduct corresponding to each count, detailing which of her disciplinary acts were at issue. While the bill of particulars was not numbered like the indictment, it contained one paragraph per count, mirroring the indictment. Rodriguez could reasonably and rightly assume that the first paragraph of criminal conduct in the bill of particulars corresponded with Count 1 and so on. Together, the indictment and bill of particulars allowed Rodriguez to know the nature of the charges against her and prepare her defense, as evidenced by her counsel's correctly differentiating between the counts during closing argument and at sentencing. This satisfies due process.

{¶ 52} Further, there are no double-jeopardy concerns here. Since the bill of particulars set forth the specific acts the State alleged were abusive, Rodriguez had sufficient notice of the offenses to protect herself from a subsequent prosecution for the same offenses. Both before and during trial, the State outlined specific acts it called criminal and correlated those acts to the indictment's counts, using the bill of particulars, evidence, and closing argument. Like in *Sowell*, the witnesses here provided testimony about the conduct alleged in each count. C.D. testified in detail about 11 distinct punishment incidents and techniques, and P.D., A.D., K.S., Angela, and medical professionals corroborated his testimony. While

every witness did not testify to each specific punishment incident or technique, the combined testimony provided examples of separate, distinct disciplinary acts. The witnesses did not say the count numbers when discussing the punishments, but the State did in its closing argument, sometimes twice.

{¶ 53} Accordingly, in a future prosecution for forcing C.D. to stand in a corner, forcing him to lean against the wall on his fingertips, isolating him in his bedroom with cameras and alarms, or restricting food from him to the point of malnourishment between January 2018 and April 2021, Rodriguez would be able to plead that she has already been convicted for those acts—on Counts 2, 4, 6, and 10, respectively. Likewise, the acquittals on the other counts mean that the State may not further prosecute Rodriguez for any of the following acts committed during the same period: forcing C.D. to sit on a bench, forcing him to stand in an "imaginary box" in his bedroom, isolating him in his room with cameras and alarms, allowing him to wear only a diaper or his brother's shorts and to have only a baby blanket, beating him with a belt, beating him with a spoon, or prohibiting him from using the bathroom. Nor may the State ever prosecute Rodriguez again for tethering C.D. to his bed overnight from January 1 to January 2, 2021, with no clothing or blankets. Therefore, Rodriguez faces no issue "plead[ing] convictions or acquittals as a bar to future prosecutions," *Valentine*, 395 F.3d at 634.

{¶ 54} Similarly, Rodriguez faces no possibility of multiple punishments for the same offense. The counts against her each corresponded to a distinct disciplinary act. Rodriguez was not charged with multiple counts that were based on the same act, and the jury knew this through the State's closing argument and evidence. The jury was able to determine whether the specific act had occurred and whether the elements of endangering children were met regarding that act. Accordingly, she is at no risk of "being punished multiple times for what may have been the same offense," *id.* at 634-635.

{¶ 55} Nevertheless, Rodriguez argues that there is no way to know which acts the jury found criminal because the jury's questions show that the jurors were confused about which punishments aligned with which counts. However, like the defendant in *Sowell*, Rodriguez does know what she was convicted of because each count corresponded to a specific act, as shown above. The verdicts themselves prove that the jury could distinguish between counts since Rodriguez was convicted of only four of the 11 counts. If the jurors did not know which count correlated with which disciplinary act, they would more likely have either convicted or acquitted Rodriguez on all counts. However, the fact that the jury found Rodriguez guilty on only four counts demonstrates that it could parse out the evidence for each count. Therefore, while the State's closing argument was not evidence, *see State v. Maurer*, 15 Ohio St.3d 239, 269 (1984), the jurors heard it, which enabled them to distinguish between each count.

{¶ 56} Overall, with the bill of particulars and evidence presented, Rodriguez can effectively appeal her convictions since evidence that correlated to each count was presented. This resolves any alleged due-process and double-jeopardy issues.

### 2. *The First District Majority Lost Its Way*

{¶ 57} Despite binding precedent like *Sowell*, the First District majority cited three nonbinding cases in support of its finding of plain error: *Valentine*, 395 F.3d 626, from the United States Court of Appeals for the Sixth Circuit; *State v. Shaw*, 2008-Ohio-1317 (2d Dist.), from the Second District Court of Appeals; and *Harp v. Commonwealth*, 266 S.W.3d 813 (Ky. 2008), from the Supreme Court of Kentucky. *See* 2025-Ohio-53 at ¶ 33-40, 47 (1st Dist.). But this reliance was in error because in addition to being nonbinding, these cases are plainly distinguishable from the case at hand.

{¶ 58} *Valentine* and *Shaw* involved carbon-copy counts of the same act occurring multiple times. *See Valentine* at 632-634; *Shaw* at ¶ 3-4, 21. In both

cases, the government never differentiated between the counts, either before or during trial. *See Valentine* at 632-633; *Shaw* at ¶ 23-25. Conversely, here, Rodriguez's indictment charged 11 counts of endangering children based on 11 distinguishable disciplinary acts, not the same act occurring 11 times over several years. Additionally, the State differentiated the counts in its bill of particulars and during its closing argument. Accordingly, *Valentine* and *Shaw* are easily distinguishable.

**{¶ 59}** Similarly, we find *Harp* distinguishable. The Supreme Court of Kentucky has held that in cases involving multicount indictments, jury instructions must factually distinguish between the counts. *Harp* at 817-818. In *Harp*, that court concluded that failing to provide such instructions would lead to reversible error if a defendant timely objected. *Id.* at 818. However, as shown above, we find that the constitutional requirements were met here, and we see no need to expand the law regarding jury instructions to follow Kentucky. Even if we were to adopt the *Harp* rule in Ohio, Rodriguez failed to timely object to the jury instructions here, making *Harp* distinguishable.

### III. CONCLUSION

**{¶ 60}** We hold that in a case involving carbon-copy counts of the same offense, the State need only present evidence of discernible facts corresponding to each count in order to obtain convictions on those counts. The State did so here, and the jury instructions, verdict forms, and trial-court judge's answers to the jury's questions were legally sufficient as well, meaning that no error occurred. Therefore, we reverse the First District Court of Appeals' judgment and remand this matter to that court for consideration of Rodriguez's second assignment of error.

Judgment reversed
and cause remanded.

————————————

**BRUNNER, J., dissenting.**

**{¶ 61}** I respectfully dissent.  The Fifth and Fourteenth Amendments to the United States Constitution "demand that if a defendant is going to be charged with multiple counts of the same crime, there must be some minimal differentiation between the counts at some point in the proceeding."  *Valentine v. Konteh*, 395 F.3d 626, 638 (6th Cir. 2005).  A failure to ensure that the jury is provided this minimal differentiation between the counts constitutes plain error.  *See State v. Gardner*, 2008-Ohio-2787, ¶ 79 (lead opinion) (declining to find plain error when "[t]here [was] no suggestion of jury confusion" and "[t]he jury did not question the meaning of the 'any criminal offense' element" of the criminal statute at issue).

**{¶ 62}** The record in the present case shows that the trial court did not provide the jury with sufficient information connecting the 11 categories of punishments alleged by the State to each of the 11 counts of endangering children charged in the indictment on which the jury was asked to render verdicts.  The trial was lengthy, lasting over two weeks.  The State presented a substantial amount of evidence: 19 different witnesses testified over 11 days of trial.  The defense then presented testimony from four witnesses on one day of trial.

**{¶ 63}** The trial court prohibited the members of the jury from taking notes.  The evidence in the record in the form of the witnesses' testimony also did not provide jurors with sufficient and clear information about which alleged punishments related to the various counts.  As the majority opinion acknowledges, "[t]he witnesses did not say the count numbers when discussing the punishments."  Majority opinion, ¶ 52.  The only time the jury was told which alleged punishment was at issue for each count was during the State's closing argument.  But the trial court instructed the jury that the closing arguments of the parties were not evidence, and even if it might have served to help organize the evidence, the State's closing argument was disjointed and presented the information in a confusing manner.  For example, during closing argument, the State referred to a "trauma timeline" created

by the alleged victim that identified certain punishments, but the timeline did not follow the order in which the counts were numbered in the indictment. Even as a visual aid, the trauma timeline did not provide sufficient and clear information or clear up the potential for jury confusion as to which alleged punishment related to each of the 11 counts.

{¶ 64} It is not surprising that once deliberations began, the jury asked the trial court, "[W]hich punishment corresponds to each count?" In response, the court told the jury to consider "the jury instructions and the testimony and the evidence that was presented," none of which actually connected evidence of each alleged punishment to a particular count in the indictment. Again, and not surprisingly, during the next day of deliberations, the jury still did not know which alleged punishment was connected to each of the 11 counts, as shown by the jury's submission to the court of a note, which read: "Our question is 'which count aligns with each separate and distinct matter?' We are referencing page 6 under 'multiple counts' in the jury instructions." The trial-court judge responded with the following: "My answer is the same as it was on Friday; refer to the jury instructions, use your collective memories to apply to the testimony and evidence that was presented to the instructions."

{¶ 65} In my view, the trial court erred by not giving the jury sufficient information for it to connect the evidence of the 11 categories of punishments alleged by the State to each of the 11 counts of endangering children charged in the indictment on which the jury was asked to render verdicts. That is plain error. As the First District Court of Appeals recognized, "[t]he defect is apparent on the record, as the jury asked two separate questions about how to determine which act corresponded to which count. Absent further guidance, the jury was unable to make this determination." 2025-Ohio-53, ¶ 54 (1st Dist.). Moreover, the error affected appellee Amy Rodriguez's substantial rights in that she is unable to challenge the sufficiency or the manifest weight of the evidence on appeal. This is because it is

not possible to know which evidence of which alleged punishments the jury found sufficient to support its four guilty verdicts and which evidence of which alleged punishments the jury found insufficient to support guilty verdicts as to the seven other counts, resulting in seven not-guilty verdicts. This type of error is also a form of structural error. *See State v. Bond*, 2022-Ohio-4150, ¶ 32 ("a structural error may affect substantial rights even if the defendant cannot show that the outcome of the trial would have been different had the error not occurred").

{¶ 66} When describing the trial-court proceedings, the majority opinion reconstructs the record, thereby—intentionally or not—appearing to resolve problems in the record as it was filed instead of reflecting how it was presented to the jury. The fact that a reviewing court can look at an entire record and sort it out does not mean that a jury has that same expertise, time, or luxury of hindsight to do the same, especially when no notetaking is permitted during the trial. For instance, the majority opinion adds numbers in brackets before paragraphs of the bill of particulars to help show that the paragraphs correspond to the counts in the indictment. It also summarizes the trial testimony on a count-by-count basis instead of a witness-by-witness basis. But the jury did not have the benefit of the evidence being this coherent and neatly organized and presented at trial. Nor could it have without the trial court's permission to at least take notes during the trial.

{¶ 67} In its analysis, the majority opinion sidesteps the core legal argument presented by Rodriguez. With respect to the jury instructions, the verdict forms, and the trial-court judge's answers to the jury's questions, the majority opinion separately considers each one, concluding that none was independently unlawful and that Rodriguez had sufficient notice of which alleged punishment was connected to each count. These conclusions do not demonstrate the sufficiency of the evidence or the weight that the jury would have assigned to the evidence. Nor do these conclusions demonstrate how the jury could have connected evidence necessary to convict Rodriguez on particular counts of the indictment. Moreover,

the jury itself stated on two separate occasions during its deliberations that it *could not* make these connections and asked the trial court to clarify, which the court declined to do beyond providing general instructions referring to the jury instructions and the testimony and evidence that was presented.

{¶ 68} Even though the majority, near the end of its analysis, acknowledges Rodriguez's main argument, *see* majority opinion at ¶ 55 ("Rodriguez argues that there is no way to know which acts the jury found criminal because the jury's questions show that the jurors were confused about which punishments aligned with which counts"), it does not engage with the argument directly. Instead, the majority opinion seems to make the illogical assumption that the jury must not have been confused, based on the fact that the jury reached a mixed verdict, which showed that it could "distinguish between counts," *id.* In other words, "the fact that the jury found Rodriguez guilty on only four counts demonstrates that it could parse out the evidence for each count." *Id.* This type of platitudinal surface-depth reasoning does not get to the heart of Rodriguez's primary argument for constitutional relief. We should not reconstruct a record to cure deficient jury instructions so that the evidence makes more sense to us, especially when creating caselaw. Nor should we compound that troubling practice by ignoring a party's core claim for constitutional relief made *because* of such jury instructions. This court should address Rodriguez's claim directly on appellate review. The jury had no plausible means from the instructions it was given to sort out the evidence of each category of punishment and relate it to each count of the indictment.

{¶ 69} Ultimately, the majority opinion is probably best understood as relying on a presumption: that we presume that a jury is able to remember which alleged punishment is connected to each count of the indictment—even when the jury explicitly tells the trial-court judge during its deliberations (twice!) that it does not remember which punishment is connected to each count. Such a presumption has no basis in law and would strike ordinary citizens as a great example of

unwarranted legal alchemy.

**{¶ 70}** Because the record does not demonstrate that the jury had enough information to render verdicts on all 11 categories of punishments alleged by the State based on the 11 counts of the indictment on which the jury was asked to render verdicts, I would affirm the judgment of the First District Court of Appeals. Because the majority opinion concludes otherwise, I respectfully dissent.

_____

Connie Pillich, Hamilton County Prosecuting Attorney, and Jon Vogt, Assistant Prosecuting Attorney, for appellant.

Elizabeth R. Miller, Ohio Public Defender, and Craig M. Jacquith, Assistant Public Defender, for appellee.

D. Andrew Wilson, Attorney General, Mathura J. Sridharan, Solicitor General, and Jana M. Bosch, Deputy Solicitor General, urging reversal for amicus curiae, Ohio Attorney General D. Andrew Wilson.

_____